IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| PATRISHA MOORE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION |
| v. | ) | |
| | ) | No. 08-4030-JAR-DWB |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

REPORT AND RECOMMENDATION

This case is before the court for consideration of the
Commissioner's Motion to Reverse and Remand and for Entry of
Final Judgment (Docs. 13 & 17), and of plaintiff's Social
Security Brief filed in accordance with D. Kan. Rule 83.7.1 and
in accordance with the court's Scheduling Order.  (Docs. 16, 18).
Briefing is complete and the case is ready for decision.  The
court recommends the Commissioner's decision be REVERSED and
judgment be entered pursuant to the fourth sentence of 42 U.S.C.
§ 405(g) REMANDING the case for an immediate award of benefits
for the closed period from Nov. 30, 1994 through Mar. 23, 1998.

I.   Background

Plaintiff applied for supplemental security income (SSI) and
disability insurance benefits (DIB) in October and December,

1994, respectively, alleging disability since July, 1994.  (R. 31-34, 63-66).  Plaintiff amended her alleged onset date to Nov. 30, 1994 in an "Opening Statement" submitted in writing prior to an Administrative Law Judge (ALJ) hearing in 1996.  (R. 17, 298). In due course plaintiff sought judicial review in the district court, the Commissioner sought remand for further proceedings, and the court remanded on Mar. 18, 1999 for the Commissioner to properly evaluate plaintiff's alleged mental impairments and to complete a Psychological Review Technique Form.  (R. 464-76)(Copies of proceedings in the district court, Moore v. Apfel, No. 98-4086-RDR (D. Kan. 1999)).

While proceedings before the district court were pending, the ALJ who issued the first decision retired, and on remand the case was assigned to ALJ Jack R. Reed.  (R. 658).  Also while the first court proceedings were pending, plaintiff filed additional applications for DIB and SSI which were approved, and plaintiff was granted a period of disability commencing on Mar. 24, 1998. (R. 798).  On remand, additional proceedings were conducted and additional evidence was received.  (R. 479-655).  Another hearing was held Jun. 12, 2000.  (R. 656-706).  In the second hearing ALJ Reed recognized that the case before him concerned only whether plaintiff was disabled during the period between Nov. 30, 1994 and Mar. 23, 1998.  (R. 660-61).  On Jul. 24, 2000, ALJ Reed filed a decision denying plaintiff's applications.  (R. 442-63).

In due course, plaintiff again sought judicial review by the district court, the district court upheld the Commissioner's decision, and plaintiff appealed to the Tenth Circuit Court of Appeals. (R. 805-06).[1]  The Tenth Circuit held "that substantial evidence supports the ALJ's finding that plaintiff did not have a disabling mental impairment during the period prior to March 24, 1998," but that "because the ALJ did not accurately perceive the nature of plaintiff's fibromyalgia, he erroneously failed to properly consider both the treating physician's opinions and plaintiff's statements regarding her symptoms," and failed to specify the weight given the treating physician's opinions. (R. 820).  Therefore, the Tenth Circuit ordered remand for further proceedings consistent with its order and judgment, and the district court remanded the case. (R. 831, 802-03, 834).

On remand, additional proceedings were held, additional evidence was submitted, and a third hearing was held before ALJ Reed on Jun. 2, 2005. (R. 839-915).  At the third hearing, plaintiff was present and was represented by an attorney, and testimony was taken from a medical expert, Dr. Brahms, and a vocational expert, Dr. Sherman. (R. 899-915).  Plaintiff did not testify at the third hearing. (R. 908).

---

[1]The Tenth Circuit opinion may be found at <u>Moore v. Barnhart</u>, No. 03-3253, 2004 WL 2634571, 114 Fed. Appx. 983 (10th Cir. Nov. 19, 2004), but here the court will cite to the copy of that opinion which is included in the administrative record.

-3-

On Sept. 21, 2005, the ALJ filed a decision finding plaintiff not disabled during the relevant time period within the meaning of the Social Security Act (hereinafter, the Act), and denied plaintiff's applications.[2] (R. 764-80). Plaintiff disagreed with the decision and filed exceptions with the Appeals Council, but the Council declined to assume jurisdiction over the decision on remand. (R. 707-60, 781-87). Therefore, the Sept. 21, 2005 decision (third decision) is the final decision of the Commissioner. (R. 783); Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004); 20 C.F.R. §§ 404.984, 416.1484 (2005). Plaintiff now for the third time seeks judicial review.

## II. Legal Standard

The court's review is guided by the Act. 42 U.S.C. §§ 405(g), 1383(c)(3). Section 405(g) provides, "The findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive." The court must determine whether the factual findings are supported by substantial evidence in the record and whether the ALJ applied the correct legal standard. Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007); White v. Barnhart, 287 F.3d 903, 905 (10th Cir. 2001). Substantial

---

[2]The decision refers to applications filed Apr. 15, and Apr. 30, 1998 (R. 764, 779-80), but the decision acknowledges that the relevant period is Nov. 30, 1994 through Mar. 23, 1998 (766), and the exhibits cited (Exs. 1 & 7) reveal that the applications at issue were dated Dec. 16, 1994, and Oct. 18, 1994. (R. 35, 47). The applications under which disability was granted in 1998 were apparently filed on Apr. 13, and Apr. 30, 1998. (R. 798).

evidence is more than a scintilla, but less than a preponderance, it is such evidence as a reasonable mind might accept to support a conclusion.  Zoltanski v. F.A.A., 372 F.3d 1195, 1200 (10th Cir. 2004); Gossett v. Bowen, 862 F.2d 802, 804 (10th Cir. 1988). The court may "neither reweigh the evidence nor substitute [it's] judgment for that of the agency."  White, 287 F.3d at 905 (quoting Casias v. Sec'y of Health & Human Serv., 933 F.2d 799, 800 (10th Cir. 1991)); Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005).  The determination of whether substantial evidence supports the Commissioner's decision, however, is not simply a quantitative exercise, for evidence is not substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion.  Gossett, 862 F.2d at 804-05; Ray v. Bowen, 865 F.2d 222, 224 (10th Cir. 1989).

An individual is under a disability only if that individual can establish that she has a physical or mental impairment which prevents her from engaging in substantial gainful activity and is expected to result in death or to last for a continuous period of at least twelve months.  42 U.S.C. § 423(d).  The claimant's impairments must be of such severity that she is not only unable to perform her past relevant work, but cannot, considering her age, education, and work experience, engage in any other substantial gainful work existing in the national economy.  Id.

**III. The Parties' Arguments**

-5-

The Commissioner seeks remand to assign a different ALJ, schedule a supplemental hearing, provide an opportunity for plaintiff to testify, and consider plaintiff's arguments and Dr. McKinney's letter.  (Comm'r Mem. in Support of Remand, 1).  He acknowledges that remand is necessary:  because the ALJ erroneously concluded that plaintiff was not present at the administrative hearing and was unavailable to answer the ALJ's questions; because the ALJ implied clarification was also needed from plaintiff's treating physician, Dr. McKinney, but erroneously found that "Dr. McKinney was 'unavailable due to her retirement'" (Comm'r Resp. 2)(quoting the decision (R. 775)); and because it is necessary for the ALJ to consider Dr. McKinney's letter dated Oct. 25, 2005 presented for the first time to the Appeals Council.

Plaintiff also states that remand is necessary; argues that the ALJ erred in evaluating both Dr. McKinney's treating source opinion and the opinion of the medical examiner (ME), Dr. Brahms; argues that the ALJ failed to relate the residual functional capacity (RFC) assessment to any record evidence; and argues that the ALJ repeated many of the errors found on judicial review of the two earlier decisions.  She argues that remand for an immediate award of benefits is the only relief appropriate in this circumstance and suggests numerous reasons to support that argument:  (1) the applications at issue have been pending since

-6-

October, 1994; (2) this case has been remanded previously by both the district court and the court of appeals; (3) the period at issue ended Mar. 23, 1998 and no further development of the record in regard to that period is necessary; (4) there have been three ALJ hearings in this case, all attended by plaintiff, and at two of which plaintiff testified; (5) the ALJ ignored much of the Tenth Circuit's opinion and accused that court of speculating; (6) the medical evidence relevant to the period at issue has all been presented to the Commissioner; (7) the ALJ chose not to seek testimony from plaintiff at the third hearing, and failed to follow the regulations in seeking additional information from Dr. McKinney; (8) further proceedings will only delay the case and cause unnecessary expenditure of time and resources; (9) the record contains all of the evidence regarding the period at issue, including concurrent opinions from plaintiff's treating source, and further medical development would merely involve an attempt to procure a retrospective analysis--ten to fourteen years after the fact; (10) the Appeals Council further delayed the progress of this case after plaintiff submitted her exceptions to the ALJ's decision by taking twenty-three months to decide to decline jurisdiction over the decision on remand; (11) remand for further proceedings would "only allow the Commissioner the opportunity to drum up new excuses for not

properly addressing Dr. McKinney's opinion;" and, (12) the evidence supports award of benefits.  (Pl. Br. 42-45).

The Commissioner argues that an erroneous decision does not automatically entitle a claimant to remand for an award of benefits, and that further proceedings are necessary when there remains a substantial issue to determine.  (Comm'r Resp. 3).  He asserts that this "case should be remanded for further proceedings in order for the ALJ to fully question Plaintiff and for the ALJ to consider the new evidence from Dr. McKinney, Plaintiff's treating physician."  Id.

## IV.  Analysis

The parties agree that the decision on remand is erroneous and that remand pursuant to the fourth sentence of 42 U.S.C. § 405(g) is necessary.  The issue here is whether the case should be remanded for an immediate award of benefits or for further proceedings.  Plaintiff claims the evidence has been fully developed and supports a decision to remand for immediate award of benefits, but the Commissioner argues that further proceedings are necessary to fully question plaintiff and to properly consider Dr. McKinney's opinions, including the Oct. 2005 letter.

### A.  Applicable Law

Whether to remand the case for further proceedings or for an immediate award of benefits is within the discretion of the district court.  Ragland v. Shalala, 992 F.2d 1056, 1060 (10th

Cir. 1993); <u>Taylor v. Callahan</u>, 969 F. Supp. 664, 673 (D. Kan. 1997) (citing <u>Dixon v. Heckler</u>, 811 F.2d 506, 511 (10th Cir. 1987)).  The decision to direct an award of benefits should be made only when the administrative record has been fully developed and when substantial and uncontradicted evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits.  <u>Gilliland v. Heckler</u>, 786 F.2d 178, 184, 185 (3rd Cir. 1986); <u>see also</u>, <u>Thompson v. Sullivan</u>, 987 F.2d 1482, 1492 (10th Cir. 1993)(remand for further proceedings when the record "does not substantially support a finding of disabled any more than it supports a finding of not disabled").  However, the Commissioner is not entitled to adjudicate a case <u>ad</u> <u>infinitum</u> until he correctly applies the proper legal standard and gathers evidence to support his conclusion.  <u>Sisco v. Dep't of Health & Human Servs.</u>, 10 F.3d 739, 746 (10th Cir. 1993).

In 2006, the Tenth Circuit noted two primary factors relevant to whether to remand for an immediate award of benefits: Length of time the matter has been pending and "whether or not 'given the available evidence, remand for additional fact-finding would serve [any] useful purpose but would merely delay the receipt of benefits." <u>Salazar v. Barnhart</u>, 468 F.3d 615, 626 (10th Cir. 2006)(quoting <u>Harris v. Sec'y of Health & Human Servs.</u>, 821 F.2d 541, 545 (10th Cir. 1987); and citing <u>Sisco</u>, 10 F.3d at 746).

Courts in this jurisdiction have considered the following factors in determining whether to remand for further proceedings or to remand for an immediate award of benefits:  (a) Time passed since the claimant applied for benefits.  Blackwell v. Astrue, 522 F. Supp. 2d 1347, 1351 (D. Kan. 2007); Smith v. Astrue, 507 F. Supp. 2d 1170, 1187 (D. Kan. 2007); Grimes v. Astrue, No. 07-4007-RDR, 2008 WL 1924936 at *8 (D. Kan. Apr. 30, 2008); Frost, ex rel. Frost v. Astrue, No. 07-4056-JAR, 2008 WL 1924126 at *13 (D. Kan. Apr. 29, 2008); Wiley v. Astrue, No. 06-4091-RDR, 2008 WL 110892 at *5, (D. Kan. Jan. 07, 2008); Sommerville v. Astrue, No. 06-1110-JTM, 2007 WL 2176007 at * 13-14 (D. Kan. July 24, 2007).  (b) Whether additional fact-finding would serve a useful purpose.  Blackwell, 522 F. Supp. 2d at 1351; Grimes, 2008 WL 1924936 at *8; Frost, 2008 WL 1924126 at *13; Wiley, 2008 WL 110892 at *5; Hull v. Astrue, No. 06-1372-WEB, 2007 WL 4239468 at *10 (D. Kan. Oct. 10, 2007.  (c) Number of previous erroneous ALJ decisions.  Smith, 507 F. Supp. 2d at 1187; Sommerville, 2007 WL 2176007 at * 13-14.  (d) Number of remands.  Smith, 507 F. Supp. 2d at 1187; Frost, 2008 WL 1924126 at *13.  (e) Substantial and uncontradicted evidence on the record as a whole.  Wiley, 2008 WL 110892 at *5; Sommerville, 2007 WL 2176007 at * 13-14; Hull, 2007 WL 4239468 at *10.  (f) Repeated, identical ALJ errors; Smith, 507 F. Supp. 2d at 1187.  (g) Likelihood that a medical professional could provide a retrospective analysis of claimant's

-10-

condition in an earlier period.  <u>Smith</u>, 507 F. Supp. 2d at 1187;
<u>Sommerville</u>, 2007 WL 2176007 at * 13-14.  (h) No reasonable basis
to discount treating physician opinion.  <u>Smith</u>, 507 F. Supp. 2d
at 1187; <u>Sommerville</u>, 2007 WL 2176007 at * 13-14.

(i) Evidentiary record is complete.  <u>Sommerville</u>, 2007 WL 2176007
at * 13-14.  And, (j) Commissioner's failure to satisfy the
burden of proof at step five.  <u>Sommerville</u>, 2007 WL 2176007 at *
13-14; <u>Roe v. Barnhart</u>, No. 05-1133-JTM, 2006 WL 4050699 at *7
(D. Kan. Aug. 28, 2006).

**B.   Delay and Failure to Apply the Court's Instructions**

Weighing heavily in the court's decision is the fact that
plaintiff's applications have been pending for fourteen years
without a proper adjudication.  There have been two earlier
decisions in this case which were determined on judicial review
to be erroneous, and now the parties agree that the third
decision is also erroneous.  Moreover, the court finds that
substantial and uncontradicted evidence on the record as a whole
indicates that the claimant is disabled and entitled to benefits,
and that further proceedings would serve no useful purpose but
would merely delay the receipt of benefits.

The Tenth Circuit found that the errors in the second
decision regarding consideration of fibromyalgia, consideration
of Dr. McKinney's opinion, and the credibility determination were
all related; and that "because the ALJ did not accurately

perceive the nature of plaintiff's fibromyalgia, he erroneously failed to properly consider both the treating physician's opinions and plaintiff's statements regarding her symptoms," (R. 820).  The decision on remand reveals the same errors.  In the decision on remand, the ALJ added to his discussion and changed some of his wording from the second decision (Judge Reed's first), but the decision still reveals a lack of understanding of the nature of plaintiff's fibromyalgia.

In its opinion, the Tenth Circuit stated:

The ALJ recognized plaintiff's diagnosis of fibromyalgia, but seemed to require that it be established by a formalistic clinical or laboratory test.  See, e.g., "laboratory testing is not consistent with an impairment or combination of impairments ... reasonably expected to produce severe and intractable pain [before] ... March 24, 1998," Aplt. App. Vol. II at 445: "no laboratory test has been consistent with ... impairments ... expected to cause the level of disability alleged by [plaintiff]," id. at 446. "the clinical signs are not consistent with ... impairments ... reasonably ... expected to cause the level of pain alleged by the [plaintiff]."  Id.

(R. 820-21).  Although here the ALJ appeared to accept that fibromyalgia is often diagnosed with a "differential diagnosis," he still focused on clinical and laboratory testing.  As perhaps the best indication of this reliance, the ALJ stated, "The discussion and evaluation of the objective laboratory findings, clinical sings [sic (probably "signs")], and medical treatment of the claimant's physical impairments contained in the July 2000 decision are incorporated by reference."  (R. 770)(emphases

-12-

added).  It was the July 2000 decision's reliance on this very discussion and evaluation of the laboratory findings and clinical signs that the Tenth Circuit court found objectionable and indicative of a misperception of the nature of plaintiff's fibromyalgia.  Yet, the ALJ chose to again rely upon that discussion and evaluation, and incorporated it by reference into the decision on remand.

In the decision on remand, the ALJ attempted to make a distinction between his discussion of clinical signs and findings regarding fibromyalgia and his discussion of clinical signs and findings regarding plaintiff's other alleged impairments.  (R. 769)(noting fibromyalgia was plaintiff's most significant impairment but not her only impairment, and listing numerous other "impairments"[3] alleged by plaintiff); (R. 770)("The Administrative Law Judge must consider not only the fibromyalgia but any/all other orthopedic, musculoskeletal, and neurological conditions."); (R. 771)("neither the laboratory findings nor the clinical signs were consistent with a cervical spine impairment that could reasonably be expected to cause severe or intractable

---

[3]Many of these "impairments" are more properly considered symptoms, and may even be symptoms associated with plaintiff's fibromyalgia.  E.g., "back and neck problems," headaches, nausea, weakness, depression, vomiting, numbness, irritability, color changes, coldness, wetness, concentration deficits, bladder problems, bowel dysfunction, difficulty walking, balance disturbance, tingling, swelling, vision problems, hearing problems, dizziness, etc.  (R. 769).

pain during the November 1994-March 1998 period"); (R. 772)
("neither the laboratory findings nor the clinical signs were
consistent with a medically determinable impartment [sic] that
could reasonably be expected to cause these alleged problems
during the November 1994-March 1998 period"); (R. 773)("the level
of 1994-98 treatment as to the back, hands, legs, and arms is not
consistent with the claimant's complaints"); (R. 775)("Many of
the opinions were not based just upon the fibromyalgia, but also
upon the depression, cervical spine disorder, etc.  The latter
are impairments where neither Dr. McKinney nor another
treating/examining physician found objective evidence of a
medically [determinable?] impairment(s) that could reasonably be
expected to cause the level of disability alleged."); (R. 775-
76)("Although Dr. McKinney mentions 'symptoms' of muscle
weakness, subjective swelling, and numbness and tingling and
cites problems with 'minimal' degenerative changes of the
cervical spine on August 11, 1996, the physician did not evaluate
the same with EMG, NCVS, x-rays other than the cervical spine,
MRI, CT scan, myelograms.").

     Apparently the ALJ was attempting to assert that although
fibromyalgia is not shown by clinical signs and laboratory
findings, plaintiff's other "impairments" should have been
supported by clinical signs and laboratory findings.  This is a
reasonable expectation so long as the other "impairments" at

-14-

issue are not related to, or a part of, plaintiff's fibromyalgia. The record contains evidence suggesting that is precisely the case with many of the symptoms alleged by plaintiff. (R. 889-97)(Ex. 132)(Medical articles discussing fibromyalgia).  The fibromyalgia articles provided by plaintiff's counsel indicate that symptoms including chronic widespread pain, tender points, fatigue, sleep disturbances, stiffness, paraesthesias, headaches, irritable bowel syndrome, Raynaud's-like symptoms, depression, anxiety, female urethral syndrome, primary dysmenorrhea, breathlessness, mitral valve prolapse, vestibular dysfunction, temporomandibular joint dysfunction, neurologic symptoms, hypothyroidism, increased bone turnover, Sjogren's syndrome/sicca symptoms, "tension" headache, facial pain, leg/foot pain, and carpal tunnel syndrome, all are symptoms or "associated symptoms" of fibromyalgia.  (R. 890, fig. 16.1; 896, Table 29-1).  This evidence was available to the ALJ, was cited by the ALJ, and the ALJ specifically noted that plaintiff's attorney had submitted the evidence.  (R. 770, 775)(citing Ex. 132).  The ALJ failed to recognize that the potential relationship between plaintiff's fibromyalgia and the other "impairments" (or symptoms) at issue precludes the distinction attempted.  This error reflects a continuing misperception of the nature of fibromyalgia.

The ALJ committed other errors related to his misperception and his failure to follow the instructions of the court of

appeals.  The Tenth Circuit noted that the ALJ's fundamental misperception of the nature of fibromyalgia was reflected in his statement in the second decision that "Dr. McKinney's opinions on plaintiff's limitations appeared to be based 'more on [plaintiff's] subjective complaints and the diagnosis of fibromyalgia than on any clinical signs or laboratory findings.'" (R. 821).  Nonetheless, the third decision contains nearly the identical finding:  "Many of [Dr. McKinney's] opinions are based upon the claimant's subjective complaints, rather than clinical signs or laboratory findings."  (R. 775).  The fact that the ALJ no longer specifically stated that a diagnosis of fibromyalgia was a basis for Dr. McKinney's opinions is of little import since Dr. McKinney stated fibromyalgia was a basis for her opinion. Again, the decision reveals that the ALJ is unwilling to accept there are no diagnostic tests which will reveal the presence and the severity of fibromyalgia.

Additionally, the Tenth Circuit "noted that the ALJ suggested numerous procedures and 'treatments' that plaintiff did not undergo . . ., without any corresponding determination that any of these were ever medically prescribed or would have achieved a better diagnosis or relief from pain." (R. 828-29)(parenthetic omitted).  In the decision on remand, the ALJ repeated this error:

> Despite the complaints of numbness, tingling, swelling,
> arthritis, and cervical spine impairment, the claimant

-16-

has only undergone the previously mentioned left upper
extremity EMG/NCVS and cervical spine x-rays.  There
has been no lower extremity, upper extremity, or lumbar
spine x-rays, EMG, NCVS, MRI, CT scan, or myelograms.
While there was 1994 emergency room treatment (Ex. 20),
1995 chiropractic adjustments (Exs. 23 and 25), and
1997 physical therapy (Ex. 94), this was sporadic and
short-lived.  There have been no surgeries, osteopathic
manipulations, or acupuncture.  There was no use of a
TENS unit, neck brace, back brace, leg brace, wrist
splint, etc.  She has not attended a pain clinic, work-
hardening program, or behavior-modification program.
In short the level of 1994-98 treatment as to the back,
hands, legs, and arms is not consistent with the
claimant's complaints.

(R. 773).  With but <u>one</u> exception, there is no basis in the

record to believe that any of the potential additional treatment

discussed should have been recommended, or that they would have

provided any relief or assistance to plaintiff's condition.  The

one exception is Dr. Wilson's 1995 recommendation that plaintiff

participate in a pain clinic at the Kansas Rehabilitation

Hospital.  (R. 136, 235).

In the second decision, ALJ Reed noted that plaintiff did

not follow through on attending the pain clinic, and stated,

"While the reason might have been financial, the Administrative

Law Judge notes that the claimant received a $10,000 judgement

. . ., has been on Medicaid for some time, and will be eligible

for Medicare 24 months after disability onset," thus implying

that plaintiff had the resources to participate in the clinic.

(R. 446-47, n.3).  In its opinion, the Tenth Circuit noted the

ALJ made no finding that plaintiff had received all of the funds

-17-

from the judgment, and did not mention the $7,000 cost of the clinic.  It concluded, "This apparent inference that plaintiff had available resources with which to pursue other avenues for pain relief is thus pure speculation."  (R. 824, n. 4).

In the third decision, the ALJ once again made no finding whether plaintiff had received all of the funds from the $10,000 settlement, noted "the fact that the claimant has been on both Medicaid and Medicare," and noted that there was a worker's compensation claim with regard to plaintiff's back pain.  (R. 773, n.11).  The ALJ stated, "The Tenth Circuit Court of Appeals speculated that the claimant could not afford the pain clinic treatment," and then concluded that the ALJ was precluded from resolving that question because plaintiff did not attend the hearing.  Id.

The ALJ's treatment of this issue is erroneous on several levels.  First, the Tenth Circuit did not speculate regarding whether plaintiff could or could not afford the pain clinic. Rather, it found that the ALJ had apparently inferred based on mere speculation that plaintiff had the resources to attend the pain clinic.  The implication of the Tenth Circuit's opinion is not that plaintiff could not afford to attend the clinic. Rather, the implication is that on remand, the ALJ should make specific findings based upon record evidence or should refrain from speculation regarding reasons for not attending the clinic.

Second, as plaintiff points out, there is no evidence in the record that plaintiff was eligible for Medicaid or Medicare in 1995 when the pain clinic was recommended.  Moreover, there is no evidence in the record that the pain clinic costs would have been borne by worker's compensation insurance.  Thus, it is clear that the ALJ once again presented "evidence" implying that plaintiff may have been able to afford the pain clinic treatment, and once again apparently inferred based upon speculation regarding this "evidence" that plaintiff could have afforded the pain clinic but chose not to attend.  Finally, it is beyond cavil that plaintiff was present at the hearing in question, and had the ALJ attempted to do so, he could have questioned plaintiff regarding her reasons for not attending the pain clinic.

### C.   Necessity of Further Proceedings on Remand

The Commissioner argues that on remand he will assign a different ALJ, and implies that this should correct any misperception concerning the nature of fibromyalgia or any failure to follow the court's remand orders.  While a different ALJ may better understand the nature of fibromyalgia, and may better understand and follow the court's orders, the court finds no need for further fact-finding, and finds that substantial and uncontradicted evidence in the record as a whole indicates that plaintiff is disabled and entitled to benefits.

The Commissioner argues that remand is necessary for the ALJ to fully question plaintiff regarding "when she took certain prescription medications and her ability to afford treatment." (Comm'r Resp. 2).  As the Commissioner noted in his response brief, the ALJ stated in footnotes to his decision that plaintiff did not attend the hearing and the ALJ was, therefore, unable to clarify when plaintiff took certain prescription medications and whether plaintiff was able to afford the pain clinic recommended in 1995.  (R. 772, n.10, 773, n.11).  However, plaintiff in fact attended the hearing and the ALJ's failure to clarify the issues may not be attributed to any failing on the part of plaintiff or her counsel.  Moreover, regardless of when plaintiff took specific medications or whether she should have attended the pain clinic, the uncontradicted evidence of record supports a finding that plaintiff was disabled from Nov. 1994 through Mar. 1998.

The Commissioner also argues that remand is necessary for the ALJ to consider the Oct. 2005 letter from Dr. McKinney presented for the first time to the Appeals Council.  (Comm'r Resp. 2-3).  However, that letter is contained in the administrative record of this case (R. 723-25) and was considered (apparently erroneously) by the Appeals Council.  The Council found that plaintiff "made no attempt to obtain additional evidence from Dr. McKinney for consideration by the Administrative Law Judge or the Appeals Council.  In fact, since

the issuance of the Tenth Circuit Court of Appeals' remand order
you have not submitted any additional evidence for consideration.
However, the Administrative Law Judge with, [sic] specificity and
references to the evidence of record, explained why he afforded
the opinion of Dr. McKinney little weight."  (R. 782).

Contrary to the finding of the Appeals Council, plaintiff
presented additional evidence from Dr. McKinney to both the ALJ
and the Appeals Council after the Tenth Circuit remand.  To the
ALJ, plaintiff provided Exhibit 124 consisting of Dr. McKinney's
opinion dated Sept. 26, 1997 and of additional medication
records.  (R. 849-61).  To the Appeals Council, plaintiff
provided Dr. McKinney's Oct. 26, 2005 letter in which she
discussed the ALJ's decision, and clarified her opinions and
medical records with regard to plaintiff's fibromyalgia.  (R.
723-25).  Moreover, as the ALJ acknowledged and as discussed
above, plaintiff also provided two medical articles regarding
fibromyalgia.  The court is at a loss to imagine other evidence
which could have been presented.  The period at issue was Nov.
1994 through Mar. 1998.  That period ended seven years before the
June 2005 hearing and two years before the June 2000 hearing.
There is no suggestion in the record or in the parties' briefs
that there exist medical records regarding that period which were
not included in the record prior to the June 2005 hearing.  The
record was complete then and remains complete today.

### D.    The Record Medical Evidence

The ALJ discounted Dr. McKinney's opinions in part because
of the opinions of Dr. McAlester, who treated plaintiff in 1994,
and Dr. Wilson, who treated plaintiff in 1994 and 1995.  However,
those opinions are not contrary to Dr. McKinney's opinions.  As
the Tenth Circuit noted in its opinion, "The restrictions and
observances of those doctors, as described by the ALJ, generally
occurred prior to plaintiff's November 30, 1994, alleged onset
date.  In addition, the fact that neither Dr. Wilson nor Dr.
McAllister specifically thought plaintiff was unemployable in
1994 or 1995, does not necessarily mean she did not become so at
some time prior to March of 1998." (R. 824-25).  Moreover, on
Nov. 30, 1994, Dr. Wilson determined work was aggravating
plaintiff's symptoms and took her off work intending that
restriction to last for three weeks.  (R. 142).  Plaintiff never
returned to work thereafter.  Dr. Wilson never suggested that she
should do so and never rescinded the restriction.  On Dec. 23,
1994, Dr. Wilson decided plaintiff should "continue off work."
(R. 141).  On Mar. 24, 1995, he opined that plaintiff "is not
ready to return to her previous work level." (R. 135).  Although
he stated that he did "not feel she has reached maximum medical
benefits at this time" (implying plaintiff's condition would
improve and leaving open the possibility of work), he did not
plan to following up with her on a regular basis.  Id.  In fact,

there is no evidence Dr. Wilson ever treated plaintiff thereafter

or opined that plaintiff could perform work.

The ALJ summarized Dr. McKinney's medical records:

In 1995-2000, Dr. McKinney issued many opinions on the
claimant's employability.   Initially, the physician
evaluated the claimant at the request of her worker's
compensation lawyer.   Subsequently, she was a treating
physician.   On May 31, 1995, Dr. McKinney could not say
at that time whether the claimant would be able to
learn to manage her problems sufficiently to get back
into home health aide work.   However, she indicated
that it was possible (Ex. 24/7).   On July 14, 1995, Dr.
McKinney stated that the claimant was temporarily
totally disabled through August 23rd (Ex. 31/1).   On
August 21, 2005, Dr. McKinney opined that the only kind
of activity that the claimant could perform was very
light sedentary non-repetitive non-stressful activity
for 1-2 hours at most.   She was going to complete a
form for Kansas Social and Rehabilitative Services
(SRS) stating that the claimant was substantially
limited in employment (Ex. 24/6).   On  October 23,
1995, Dr. McKinney only "rated" the claimant as having
a 10% partial, permanent impairment using the *American
Medical Association Guidelines for Permanent Partial
Impairment* (Ex. 24/4).   On November 29, 2005, Dr.
McKinney "encouraged [the claimant] to try and find
some kind of a light job" (Ex. 14/1)[4].    On the same
day, she "encourage [the claimant] to try and find some
kind of a light job" (Ex. 24/1).   On March 11, 1996,
Dr. McKinney wrote the worker's compensation attorney
that the claimant was "not able to tolerate stressful
situations, she is unable to do heavy work or any
repetitive work."   The physician agreed with the
claimant when she indicated that such limitations made
it pretty hard to find a job (Ex. 30/6).   On March 24,
1996, Dr. McKinney told SRS that the claimant had
significant fibromyalgia which prevented significant
employment and which would last the rest of the
claimant's life, unless medicine came up with a cure

---

[4]Exhibit 14 is a "Disability Report" dated Dec. 1, 1994 (R.
89-96), and makes no mention of Dr. McKinney.   Apparently this is
the same quotation as that in the next sentence, and comes from
Exhibit 24, page 1.   (R. 162).

(Ex. 30/4).  On August 11, 1996, Dr. McKinney completed
the previously mentioned *Fibromyalgia Residual
Functional Capacity Questionnaire* at the request of
prior counsel.  Prognosis was "good" for life but
"poor" for normal function.  She estimated that the
claimant was limited in her ability to walk, sit,
stand, lift, and carry.  She also speculated that the
claimant would need frequent breaks, would be
frequently absent from work, would have impaired
concentration, and would have good and bad days (Ex.
49).  On September 26, 1997, Dr. McKinney opined that
the claimant was prevented from performing gainful
employment (Ex. 124/1-3).  On September 18, 1998, Dr.
McKinney told SRS that the claimant was disabled due to
"significant fibromyalgia, depression associated [with]
[decreased] sleep" (Ex. 98/2-4).  On February 1, 1999,
Dr. McKinney speculated that the claimant was limited
as to lifting, carrying, sitting, standing, and walking
(Ex. 99).

(R. 774-75).

The ALJ then concluded:

In summary, Dr. McKinney's opinions often were
conclusory as to the claimant being disabled or unable
to be gainfully employed.  They often related to the
ultimate issue of disability, an issue that is reserved
to the Commissioner of Social Security.  Many of the
opinions were not based just upon the fibromyalgia, but
also upon the depression, cervical spine disorder, etc.
The latter are impairments where neither Dr. McKinney
nor another treating/examining physician found
objective evidence of a medically impairment(s) [sic]
that could reasonably be expected to cause the level of
disability alleged.  Many of the opinions are based
upon the claimant's subjective complaints, rather than
clinical signs or laboratory findings.  The opinions
often conflict, e.g., 10% partial, permanent
disability; ability to perform a light job; ability to
perform part-time work; ability to perform non-
stressful work; ability to perform non-repetitive work,
etc.

(R. 775).

-24-

The ALJ's conclusions, however, do not follow from the evidence summarized. As discussed above, the ALJ's attempt to distinguish symptoms and restrictions resulting from fibromyalgia from those resulting from other impairments reflects a misunderstanding of the nature of fibromyalgia. The expectation that plaintiff's restrictions must be supported by clinical signs or laboratory findings also reflects a misunderstanding of the nature of fibromyalgia--as found by the Tenth Circuit in reviewing the second decision in this case and as noted by this court earlier in this opinion. The ALJ's statement that many of Dr. McKinney's opinions are based upon the claimant's subjective complaints is contrary to controlling Tenth Circuit precedent, and erroneous as suggested in the Tenth Circuit's earlier opinion in this case. (R. 821)(citing McGoffin v. Barnhart, 288 F.3d 1248, 1252 (10th Cir. 2002)); see also, Langley v. Barnhart, 373 F.3d 1116, 1121 (10th Cir. 2004)(a finding that doctor's opinion should be discounted as based on subjective complaints must have legal or evidentiary basis); Victory v. Barnhart, 121 F. App'x 819, 823-24 (10th Cir. 2005)(finding must be supported by record evidence). Moreover, rather than being in conflict, Dr. McKinney's opinions reflect a progressive and increasing conviction that plaintiff is disabled as time passed and as Dr. McKinney became more aware of plaintiff's condition.

Dr. McKinney first treated plaintiff on May 31, 1995 and noted that it was possible plaintiff would be able to return to work.  (R. 168, 172 (Ex. 24/7, 11)).  In June, Dr. McKinney noted that "her findings are not much changed."  (R. 171).  At least by July 14, 1995, Dr. McKinney diagnosed fibromyalgia.  (R. 170). In Aug. 1995, she noted that "At this point the only kind of activity [plaintiff] can do would be very light sedentary non-repetitive non-stressful activity for 1 to 2 hours at the most." (R. 167).  Although Dr. McKinney diagnosed a 10% permanent partial impairment in Oct. 1995 (R. 165), she explained that this was a diagnosis specific to making a workers compensation rating. (R. 723).  Neither the ALJ nor the Commissioner cites to any authority that such a workers compensation rating necessarily precludes a finding of disability pursuant to the Act.

As the ALJ notes, in Nov. 1995, Dr. McKinney encouraged plaintiff "to try and find some kind of a light job."  (R. 162). However, in the same note Dr. McKinney noted plaintiff's statement that "she has tried to get a job but she will get a job then gets sick and can't work."  Id.  In context, Dr. McKinney's encouragement is not so much of an opinion that plaintiff can work, as it is an attempt to encourage plaintiff to continue to do what she can.  After November 1995, every opinion given by Dr. McKinney is unequivocally to the effect that plaintiff cannot

-26-

work because of her fibromyalgia.  (R. 198-99, 264-70, 331, 536, 547-50, 849-51).

What this record shows is that in 1994 plaintiff had an automobile accident which caused problems with plaintiff's neck and back.  Thereafter, in Nov. 1994 plaintiff re-injured her back while working with a patient.  At some point in this progression, plaintiff developed fibromyalgia which caused numerous symptoms including severe pain and depression.  Each physician that treated plaintiff after the automobile accident was hopeful that plaintiff would eventually be able to return to work, but each physician agreed that plaintiff could not work.  After Dr. Wilson took plaintiff off work in Nov. 1994, plaintiff never returned to work and no treating or examining physician has stated that plaintiff was able to return to work.[5]  Although Dr. McKinney was at first hopeful that plaintiff would at some point return to work, she always opined at each point in time that plaintiff was unable to work.  As she became more familiar with plaintiff's condition she eventually opined that plaintiff would remain unable to work.

Moreover, this view of the medical evidence is confirmed by the discussion of the medical evidence in the second decision

---

[5]The court notes that Dr. Perkins provided an opinion on Oct. 10, 1997 indicating plaintiff could perform sedentary work, but there is no indication Dr. Perkins examined plaintiff, and the physician's opinion is conclusory at best.  (R. 353).

-27-

which was incorporated by reference in the decision on remand.
(R. 770).  In the second decision, the ALJ noted, "The
progressive nature of the claimant's physical impairments is also
demonstrated by the opinions of various treating and examining
medical sources," (R. 447)(emphasis added), and that "the medical
opinions confirm a slow progressive deterioration of the
claimant's physical condition."  (R. 448)(emphasis added).
Although the ALJ concluded in the second decision that
plaintiff's condition did not deteriorate to the point of
disability until after Mar. 23, 1998, that finding was based upon
a misunderstanding of the nature of plaintiff's fibromyalgia and
upon interpreting the physicians' hope that plaintiff could
return to work as an opinion that she would work in 1994-1998.

    The only medical evidence supporting a finding that
plaintiff was able to work after Nov. 30, 1994 was the opinion of
the medical expert Dr. Brahms given at the Jun. 2005 hearing.
The ALJ acknowledged that Dr. Brahms was an orthopedic specialist
not an expert in fibromyalgia, and noted that "After reviewing
all of the evidence, Dr. Brahms testified that the claimant . . .
would have been able to perform at least sedentary work."  (R.
775).

    At the hearing, the ALJ noted that he was considering
plaintiff's condition from Nov. 30, 1994 through Mar. 23, 1998.
(R. 904).  Dr. Brahms testified that plaintiff's significant

medical conditions during the relevant time frame were
fibromyalgia, depression, and pain in the cervical region.  (R.
905).  Dr. Brahms discussed some of the medical evidence in a
very generalized fashion, including quoting an emergency room
report dated Dec. 12, 1996 that revealed "no discreet trigger
points." (R. 905).  When questioned, Dr. Brahms indicated that
record was at exhibit 67, page one.  Id.  He then stated his
opinion:

> Fibromyalgia is a rule out kind of diagnosis.  If
> nothing else fits, the diagnosis of fibromyalgia is
> frequently made.  There is no question that it is a
> significant problem in a lot of individuals.  However,
> in the evidence that is found here, in some instances
> suggests the diagnosis of fibromyalgia [inaudible] does
> not.  Accordingly, it is my impression that this
> individual may be involved with fibromyalgia, but
> should be capable of performing sedentary work.

(R. 905-06).

Plaintiff's attorney questioned Dr. Brahms and elicited
testimony that Dr. Brahms' specialty is orthopedic surgery, that
other physicians do not refer patients to him for treatment of
fibromyalgia, and that Dr. Brahms has not published any articles
regarding fibromyalgia.  (R. 906).  He also elicited testimony
from Dr. Brahms that it takes eighteen "areas of pain" to make a
diagnosis for fibromyalgia.  (R. 908).

As Dr. Brahms admitted, he is not a specialist in
fibromyalgia.  His testimony indicates that he did not recognize
that eleven out of eighteen tender points is generally considered

-29-

necessary to a diagnosis of fibromyalgia.  (R. 896) (referring to 1990 criteria published by the American College of Rheumatology). Moreover, the court was unable to relate Dr. Brahms' testimony with the record in this case.

Dr. Brahms' testimony cannot be supported by the record. The court is unable to locate any emergency room records from Dec. of 1996 or any emergency room records which state "There is no discreet trigger points."  Dr. Brahms testified that the record was at page one of Exhibit 67.  But Exhibit 67, page one, is an emergency room report dated Oct. 07, 1996, says nothing regarding discreet trigger points, and reveals "multiple tender areas along the lower cervical spine," "tenderness over the mid to lower back," and "tenderness over the lateral aspect of the knee." (R. 335).  Dr. Brahms testified of a motor vehicle accident on Mar. 20, 1999, citing to "page 124 –- 124, page three," and indicating that plaintiff's fibromyalgia was severe at that time.  (R. 905).  But the court is unable to locate any records reflecting a motor vehicle accident on such a date. Exhibit 124 contains a portion of Dr. McKinney's records, and says nothing about an automobile accident.  Page 124 of the record is part of Exhibit 20, an "Initial Outpatient Evaluation" dated Aug. 23, <u>1994</u>, and refers back to plaintiff's motor vehicle accident from July 13, <u>1994</u>, but makes no mention of fibromyalgia. (R. 123-26).  The only record to which Dr. Brahms

referred in his testimony which can be confirmed by reference to
the administrative record is laboratory testing from Nov. 1996
which showed a negative anti-nuclear test, a SED rate within
normal limits, and a negative rheumatoid factor.  Compare (R.
905-06) with (R. 340-41).

Moreover, Dr. McKinney stated that fibromyalgia is within
the specialties of Rheumatology, or Physical Medicine and
Rehabilitation.  (R. 724).  The record contains no evidence
otherwise.  Dr. McKinney is board certified in Physical Medicine
and Rehabilitation.  (R. 723).  Thus, Dr. McKinney is a
specialist in the primary area of medicine at issue in this case,
whereas Dr. Brahms is not.  Dr. Brahms has no specialty in
fibromyalgia, and his testimony is not supported by the evidence
of record.  There is simply no basis in the record to accept his
opinion over that of Dr. McKinney, a treating physician with a
specialty in fibromyalgia, and with an extensive history of
treating plaintiff.

Only one conclusion is supported by the record evidence.
Plaintiff's severe impairments preclude performance of
substantial gainful activity at all times relevant to the
applications at issue here.  Therefore remand is necessary for
the Commissioner to find that plaintiff was disabled within the
meaning of the Act by a "severe" combination of medically
determinable impairments consisting of fibromyalgia, affective

disorder, and pain syndrome beginning on Nov. 30, 1994.  Based upon the applications filed on Oct. 18, 1994, and Dec. 16, 1994, the Commissioner must award a period of disability from Nov. 30, 1994 through Mar. 23, 1998, and award benefits accordingly.

**IT IS THEREFORE RECOMMENDED** that the decision of the Commissioner be REVERSED and that this case be REMANDED in accordance with the fourth sentence of 42 U.S.C. § 405(g) for an immediate award of benefits in accordance with this opinion.

Copies of this recommendation and report shall be delivered to counsel of record for the parties.  Pursuant to 28 U.S.C. § 636(b)(1), Fed. R. Civ. P. 72(b), and D. Kan. Rule 72.1.4, the parties may serve and file written objections to this recommendation within ten days after being served with a copy. Failure to timely file objections with the court will be deemed a waiver of appellate review.  Morales-Fernandez v. INS, 418 F.3d 1116, 1119 (10th Cir. 2005).

Dated this 13th day of January 2009, at Wichita, Kansas.


s/Donald W. Bostwick
**DONALD W. BOSTWICK**
**United States Magistrate Judge**